TRIPLER and others *against* OLCOTT and LORD.

Where *F.* made a bill of sale of a ship, then on her voyage, and of freight to be earned, to *L.*, which was absolute on the face of it, and *L.* sent to *O.*, the master of the ship, a copy of the bill of sale, with a power of attorney, and instructions to him as to the disposition of the property, and *O.*, considering *L.* as the owner from that time, acted as his agent, and afterwards accounted to him for the proceeds of the freight, &c. *Held*, that *O.* was not accountable to *F.* as having a *resulting trust*, though some of the letters from *L.* to *O.* incidentally mentioned that the bill of sale was intended to secure *C.* certain advances and responsibilities; there being no fraud or collusion between *L.* and *O.*

BILL stated that *Tripler & Craig*, plaintiffs, were partners in trade in the city of *New-York*; and that the plaintiff, *Fanning*, was owner of the ship *Zephyr*, of the value of 28,000 dollars, then on a voyage from *New-York* to *Nantz*, with a freight to be earned, amounting to 31,000

1818.

TRIPLER
v.
OLCOTT.

dollars; and being indebted to the defendant *Lord*, on three promissory notes, amounting to 2,569 dollars; in order to secure the payment of the same, on the 22d of *December*, 1812, by deed, assigned the said ship and freight to the defendant *Lord*, on the express agreement, that after *L.* was paid his debt and interest, he should hold the ship and surplus freight to the use of *F.*, and subject to his order. That after the arrival of the ship at *L'Orient*, and the freight had been earned, *F.* being indebted to the plaintiffs, *Tripler & Craig*, in the sum of 10,000 dollars, on the 10th of *September*, 1813, assigned to them the ship or proceeds thereof, and the surplus freight, after paying *L.*, &c. That relying on this assignment, *T. & C.* had assumed to pay out of the proceeds, remaining over and above their debt, a debt due from *F.* to the *City Bank*, amounting to 6000 dollars. That soon after this last assignment, to wit, on the 18th of *December*, 1813, *F.* executed another assignment to *T. & C.*, reciting the former assignment of the 10th of *September*, the objects of which had been executed, and that *T. & C.* had been paid the 10,000 dollars by *F.*, and that they had since lent *F.* other sums of money; to secure the payment of which, and of other sums to be lent and advanced, *F.* assigned the said ship and the homeward freight, and all the interest of *F.* in the same, in whose hands soever the same might he. This assignment was absolute, with the usual power of attorney. The defendant *O.* was master of the ship during the voyage, and continued to be master, until she was captured on her homeward voyage. That at the time of the last assignment, *T. & C.* had paid *F.* 1,200 dollars, and had since paid him 1,400 dollars, and *F.* now owed *T. & C.* 2,800 dollars, exclusive of the sum due the *City Bank*. That the defendant *L.*, after the ship arrived in *France*, applied to *F.* for directions respecting the disposal of the ship and freight: and *F.* instructed *L.* not to risk any part of them or of the proceeds, upon the homeward voyage, unless well insured; and that on the 9th of

*August,* 1813, *F.* gave directions to *L.* to write to his agents in *France* to that effect, and *L.* afterwards said that he had given such orders. That the outward freight was paid to *O.* as master, and agent for *L.* That *O.* was employed as master, by *F.* as sole owner, and at the time he received the homeward freight, he knew that *F.* was interested therein. That *L.* was informed of the two last assignments to *T. & C.* and of their advances and responsibilities for *F.;* but had given such orders as induced *O.* to act as if *T. & C.* had no interest in the ship and freight. That *O.* remitted 14,000 dollars of the outward and homeward freight to *L.* in bills of exchange which are retained as due to *L.* and *O.* That *O.* sailed from *France* to *New-York,* with freight and other property of the plaintiffs, and embarked part of the outward freight in another ship, without insurance, and in consequence of capture, the security of the plaintiffs therein has been lost.

The plaintiffs charged, that there is due to them, out of the proceeds of ship and freight, under the last assignment, 40,000 dollars. That *O.* received of the homeward freight 3,320 dollars; that if the freight out and home had been insured, as it might have been, in *France,* the plaintiffs would have been entitled to 25,000 dollars; and if the ship had also been insured, to 40,000 dollars. That the defendants have left the plaintiff *F.* charged with the payment of a premium of insurance on the outward voyage, of 11,000 dollars, the greater part of which he had paid. That the defendant *O.* threatened to depart out of the state. Prayer, that the defendant *O.* may be compelled to give security not to depart out of the state, and that the defendants may account, &c. The plaintiff made affidavit, that there would be found due to the plaintiffs, from the defendants, on a settlement of accounts, 20,000 dollars, in relation to the freight, &c. A *ne exeat* was granted the 12th of *December,* 1814, marked 10,000 dollars.

1818.

TRIPLER
v.
OLCOTT.

*Olcott*, in his answer, admitted that *F.* was owner of the ship, &c. That he, *O.*, took command of her, on the 12th of *November*, 1812, and was employed by *F.* as owner; that he acted as master under *F.* until after his arrival in *France*. That, on the 25th of *February*, 1813, he received a *letter* from *L.*, dated the 23d of *December*, 1812, inclosing a copy of a bill of sale of the ship, freight, and proceeds, to *L.;* and, also, a power of attorney from *L.* to act for him. That, from that time, he considered *L.* as the owner, and acted as agent of *L.* in respect to the ship, freight, and proceeds, and in conformity to the letters and instructions of *L.* That the proceeds of the outward freight were received by him as the agent of *L.* And he insisted, that he was accountable only to *L.* for his agency. That he would not have accepted the agency, distinct from his office as master of the ship, had he supposed that either of the plaintiffs, and not the defendant *L.*, was interested in the property. That he was first informed of the two assignments to *T. & C.* on his arrival at *New-York*, in *October*, 1814. That by his agreement with *F.*, he acted only as master; and the farther interest and concern of *F.* were intrusted by him to a supercargo, *D. Sheldon*, who acted as supercargo and agent of *F.* until *O.* received the letters of *L.*, with the bill of sale and power of attorney, with instructions as to the proceeds of freight, &c. The defendant *O.* further stated in his answer the contents of the letters of *L.*, of the 23d and 29th of *December*, 1812, and 20th of *January*, 1813, and of his instructions, and of all the transactions by him as agent. That in the letter of the 29th of *December*, 1812, *L.* stated that the bill of sale was on account of the failure of *Fanning & Coles*, and for the purpose of paying custom-house bonds, and to save friends. That, in *October*, 1813, he received a letter from *L.* dated the 16th of *August*, 1813, saying, that he took the ship and freight as security for about 6,000 dollars, and to cover a demand of *Carey*

of about 1500 dollars, and feared he should lose all, unless the property was insured in *France*. That, in *October*, 1814, the defendant and *L.* rendered to each other their respective accounts, of all their transactions and concerns, on which there was a balance due to the defendant *O.* of 1,028 dollars and 86 cents.

Evidence was taken in the cause, which was brought to a hearing, as to the defendant *O.*, in *June* last.

*Riggs* and *Baldwin*, for the plaintiffs.

*T. A. Emmet* and *Wells*, for the defendants.

THE CHANCELLOR. This case was brought to a hearing on the part of the defendant *Olcott*, and we are only to discuss the case as it regards him.

Two of the plaintiffs (*Tripler & Craig*,) have not shown any right or title whatever to an account, for they have not proved the assignment charged in the bill to have been made by *Fanning* to them on the 18th of *December*, 1813. This assignment is the only foundation of their claim, and it is not admitted by the answer. We must recur to the resulting trust of *Fanning*, as the only existing right shown on the part of the plaintiffs.

The bill of sale from *Fanning* to *Lord*, was absolute upon its face, and no resulting trust appears. Nor is there proof of the express agreement charged in the bill. The evidence, that the bill of sale was intended to be qualified and not absolute, appears from the two letters of *Lord* to *Olcott*, of the 29th of *December*, 1812, and the 16th of *August* 1813. In the one, he says, that the bill of sale arose from the failure of *Fanning*, and others, and was for the purpose of paying custom-house bonds, and to save friends; and in the other he states, that he took the ship and freight as security for about 6,000 dollars, and to cover a demand of one *Carey* for 1,500 dollars. These were

representations entirely contrary to the statement in the bill of the agreement between *Fanning* and *Lord*, made on the delivery of the bill of sale. Nor do the two accounts given in the letters correspond with each other, and they were mentioned to *Olcott* rather incidentally, and without any full, precise, and satisfactory explanation of the trust. They were not intended to form any rule or guide to *Olcott's* conduct, and he could only look to *Lord*, as the owner. The authentic evidence which he had of any right or title in the property, was the bill of sale and the letter of attorney; and he could not, and did not, recognise any other title, interest, or authority. A resulting trust, mentioned in this incidental and obscure manner, and especially when attended with the clear title and positive acts and instructions of *Lord* as owner, did not probably, attract any attention from *Olcott*; and he says, in his answer, that he considered *Lord* as the sole owner, and as having the exclusive interest, and that he would not have accepted of any agency for any other person, distinct from that of master of the ship.

On his return to the *United States*, in *October*, 1814, he duly accounts to and with *Lord*; and the question is, whether he is bound to account also to *Fanning*.

It does not appear to me, that *Olcott* could with safety or propriety, have dealt with any other person than *Lord*. He had no business or concern with the dealings between *Lord* and *Fanning*, and the loose hints communicated to him by *Lord* were of no use. It would be equally dangerous and inconvenient, in the business and affairs of the world, to deny, that *Olcott* could not definitively and safely account with *Lord*, under the circumstances of this case. If there had been fraud and collusion, charged, and proved between him and *Lord*, in the settlement, to the prejudice of the known rights of others, it would have presented a very different question. But no such allegation or proof exists; *Fanning* must look to *Lord*, and cannot look beyond

him, for an account of the management and proceeds of the property assigned to him in trust.

It is stated to have been held in *Pollard* v. *Downes*, (2 *Ch. Cas.* 121.) that where a trustee made a letter of attorney to *S.* to manage and receive the rents and profits of land, and *S.* afterwards accounted to the trustee for his agency, he was, after the death of the trustee, and on a bill by the *cestuy que trust*, directed to account to him.

That case is so destitute of all facts and circumstances requisite to a clear understanding of the principle and the application, that it can scarcely be regarded as an authority. It may be, that there was a collusion between the trustee and the agent, or that the agent had notice from the principal not to account with the trustee, or that the trust had expired at the time. It is impossible to be maintained, that if an agent duly and fairly accounts with his immediate and authorized principal, that he is bound, in all cases, to account over again to the person standing behind his immediate principal. This would be a doctrine not to be endured; there must have been something in the case cited which does not now appear, and which gave it a special direction. Lord *Eldon*, in *Beaumont* v. *Boultbee*, (7 *Vesey*, 605. 610. 617.) laid down this rule, that an account settled between an under and an upper agent, without vouchers, and upon mere confidence, was not to be considered as settled against the principal, without allowing him the liberty to surcharge and falsify those accounts. But, in that case, it appeared that the under steward, (as he was termed,) was employed both by the upper steward and the principal, and the liberty given to the principal went no farther than to *surcharge and falsify*; and that was founded on the extraordinary and unusual mode of accounting which had been adopted in that case. Under such checks and limitations, there can be no doubt that the party ought to account again to the person who has the ultimate interest. But when no special circum-

1818.

TRIPLER
v.
OLCOTT.

stances appear, and there is no fraud, then I apprehend the general rule to be otherwise, and that it was truly declared in *Clavering's* case. (*Prec. in Ch.* 535.)

The plaintiff in that case was entitled to several collieries of value, and his guardians or trustees, during his minority, had appointed the defendant an agent to manage the same, with a salary which they had increased as they saw occasion. He passed his accounts regularly with the trustees or guardians, every half year; and they, from time to time passed and allowed those accounts. The plaintiff being of age, filed his bill, not only against the trustees or guardians, but the agent, to have a general account. The agent pleaded the accounts themselves, and the plea was held good, for he was but a servant to the trustees; and as they had authority to employ him, they had the same to discharge him and allow his accounts, and he had nothing at all to do with the plaintiff; that if it were otherwise, none would ever be concerned in an infant's affairs, and the plaintiff would suffer no sort of mischief by it; for he was at full liberty to go through the whole account against the guardians or trustees, and they were only and immediately responsible to him, and would be so for the embezzlements of the servants they employed.

In the cases referred to, the character of the trustee, and the relationship between him and the principal, was, no doubt, distinctly known and declared. But in the present case, *Fanning* had clothed *Lord* with the absolute legal title, and held him out to the world, and suffered him to deal with others, as the real and absolute owner. Upon every just and safe principle, the settlement between *Olcott* and *Lord* ought to be absolute; it ought not to be opened by *Fanning*; nor the defendant *Olcott* called on to account *de novo* with him, except upon the ground of fraud and collusion, and that is not the ground taken in this case.

I am, accordingly, of opinion, that the bill, as to the defendant *Olcott*, be dismissed, with costs.

Bill dismissed, accordingly.